# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO BAYKEEPER; SURFRIDER FOUNDATION; AMERICAN CANOE ASSOCIATION; and DIVERS AGAINST POLLUTERS,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF DEFENSE; ROBERT M. GATES, in his capacity as Secretary of the U.S. Department of Defense; U.S. NAVY; RAY MABUS, in his capacity as Secretary of the Navy; U.S. MARINE CORPS; JAMES T. CONWAY, in his capacity as Commandant of the U.S. Marine Corps; and COL. NICHOLAS F. MARANO, in his capacity as Commanding Officer of U.S. Marine Corp Base Camp Pendleton,<br><br>Defendants. | CASE NO. 02-CV-0499 - IEG (AJB)<br><br>ORDER:<br><br>(1) GRANTING MOTION TO TERMINATE CONSENT DECREE; and<br><br>(2) DISMISSING CASE WITH PREJUDICE.<br><br>[Doc. No. 38] |

It has been almost seven years since the Marine Corps Base Camp Pendleton Defendants entered into the Consent Decree with Plaintiffs resolving the Clean Water Act claims that Plaintiffs filed against them. Since then, the United States has spent hundreds of millions of dollars on capital improvements at Camp Pendleton, resulting in a state-of-the-art tertiary treatment facility. As a result,

with the exception of one outlier month, Defendants were able to achieve a compliance rate between 95% and 100% as to each category of the Consent Decree over the past 12 months. Accordingly, Defendants now move the Court to terminate the Consent Decree and dismiss the case with prejudice. Having considered the parties' arguments, and for the reasons set forth below, the Court GRANTS the motion, TERMINATES the Consent Decree, and DISMISSES WITH PREJUDICE this action.

## BACKGROUND

Plaintiffs filed the complaint in this action on March 15, 2002, alleging violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"). The Court entered the Consent Decree ("Decree") in this matter on August 7, 2003. Since then, Defendants have expended over $300 million on capital improvements, resulting in a state-of-the-art tertiary treatment facility. Over this time, Defendants have also filed periodic semi-annual reports as required by the Decree.

### I. The Termination Provision of the Consent Decree

Section XV of the Decree sets out the Decree's termination provision. Section XV provides that the Decree's compliance provisions (set out in Section V) shall terminate "upon notification" from Defendants to Plaintiffs and the Court that certain objectives have been satisfied. Section V includes four "Compliance Actions," denominated subsections A, B, C, and D. The parties agree that Section V.A, which addressed Camp Pendleton's collection system spills, terminated in April 2005. [See Doc. No. 23]. Accordingly, the present dispute is over whether subsections B, C, and D have also been satisfied, such that the Decree as a whole can be finally terminated.

Under Section XV.A.2.a of the Decree, Section V.B shall terminate upon Defendants' notification that Camp Pendleton either (1) has initiated discharges from the Federally Owned Treatment Works ("FOTW") to the Pacific Ocean via the Oceanside Outfall and maintained interim compliance for its discharges via such outfall for 9 consecutive months or (2) has "ceased ongoing exceedances" of the Applicable Effluent Standards and Limitations for a period of one year after service of the Operation Notice.[1] Section XV.2.a also provides that for purposes of Section XV, "isolated or sporadic exceedances of individual effluent standards or limitations" are excluded from the definition of "ongoing exceedances."

---

[1] The Operation Notice in this case was served in January 2007.

Section V.D pertains to "Compliance Reports" and is linked to exceedances of effluent limits. Under Subsection XV.A.4, this provision terminates upon notification that Camp Pendleton has "ceased ongoing exceedances" of the Applicable Effluent Standards and Limitations as described in Section XV.A.2.a for a period of one year after the service of the Operation Notice.

Finally, Section V.C pertains to "NPDES Monitoring, Reporting, and Record-Keeping." Under Section XV.A.3(b), this provision terminates upon notification that Camp Pendleton has maintained "substantial compliance" with the requirements of Section V.C for a period of one year after service of the Operation Notice.

**II.  Defendants' Motion**

On January 15, 2010, Defendants provided written notice to Plaintiffs ("Termination Notice") setting forth the reasons why Defendants believe the three remaining subsections have been satisfied in this case. When Plaintiffs refused to join in Defendants' motion to terminate the Decree and to dismiss this action with prejudice, Defendants filed the present motion.

First, with respect to Section V.B, Defendants provide that for the 12-month period from November 2008 to October 2009 (the latest month for which data were then available), there have been only 5 effluent limit exceedances out of 2,592 possible effluent limit exceedances. These exceedances included: (1) November 20, 2008 instance, where the level of settleable solids exceeded the permit limit; and (2) four instances in September and October 2009, where chlorine residual graphs indicated slight exceedances that were very short in duration. Accordingly, because "isolated or sporadic exceedances of individual effluent standards or limitations" are excluded from the definition of "ongoing exceedances" in Section XV.A.2.a, Defendants argue they have satisfied the Decree's requirements for termination of Section V.B.

Second, because they have satisfied the Decree's requirements for termination of Section V.B, Defendants argue they have also satisfied the requirements for termination of Section V.D, which is linked to exceedances of effluent limits.

Finally, Defendants provide that they have substantially complied with the requirements of Section V.C. This subsection encompasses six categories of monitoring, recording, and record-keeping: (1) flow - excess; (2) flow - no meter; (3) flow - not recorded; (4) sample collection; (5)

1  sample analysis; and (6) chlorine analyzer. Taking these in turn, the 12-month record from November
2  2008 to October 2009 shows no compliance failures relating to the first category (flow - excess) and
3  the second category (flow - no meter). The third category (flow - not recorded) had only 3 failures out
4  of 744 possible failures, amounting to a 99.60% compliance rate.

5        With regard to the fourth category (sample collection), the record shows no compliance
6  failures during 6 of the 12 months. There were, however, isolated instances in 5 of the other 6 months.
7  Thus, there were 6 deficiencies in November 2008, which consisted of one failure to take an oil and
8  grease grab sample, and several instances when turbidity was improperly sampled. There were also
9  8 deficiencies in December 2008, including days when turbidity was improperly sampled as a
10 composite vice grab, and one day (three samples) when oil and grease samples were not properly
11 prepared by the laboratory. There were also deficiencies in March 2009 (7-day period when just 4 of
12 the 5 required BOD/TSS samples were collected), July 2009 (8 deficiencies out of 187 possible), and
13 August 2009 (8 deficiencies out of 187 possible). Finally, there was one atypical month (January
14 2009) when there was a spike of sample collection problems due to a brief adjustment period with a
15 new contractor, who improperly prepared BOD/TSS samples by failing to homogenize sub-samples,
16 failed to collect certain pH and settleable solids samples, and on several occasions exceeded the proper
17 hold time for acute/chronic toxicity test samples. However, Defendants allege they immediately
18 addressed and remedied the problem by mandating re-training of the responsible personnel. Moreover,
19 according to Defendants, these deficiencies did not impact human health or the environment.

20       With regard to the fifth category (sample analysis), Defendants provide they fully complied
21 with the applicable requirements in 8 of the 12 months, and that there were only 11 minor deficiencies
22 out of 748 possible deficiencies in the other 4 months. Finally, with regard to the sixth category
23 (chlorine analyzer), the record shows that Defendants fully complied with the applicable requirements
24 in 10 of the 12 past months, and there were only several instances in the other two months (1 day in
25 December 2008 and 3 days in November 2008) when the chlorine analyzer displayed inaccurate
26 readings. Based on the following, with January data put aside, Defendants provide that there were no
27 deficiencies over all six categories for 5 of the 12 months, and in the remaining 6 months there was
28 a compliance rate from approximately 95% to above 99%. Accordingly, Defendants argue they have

substantially complied with the Decree requirements for termination of Section V.C.

### III. Plaintiffs' Opposition

Plaintiffs do not dispute Defendants' factual representations. Moreover, it appears Plaintiffs really oppose the motion only to the extent Defendants are asking the Court to dismiss claims with respect to the on-going monitoring and reporting violations *with prejudice*. According to Plaintiffs, they are planning to file another CWA lawsuit very soon, which would pursue the violations as to the sanitary sewer overflows (i.e., the part of the Decree that terminated in April 2005) and the still on-going monitoring/reporting violations (i.e., Section V.C of the current Decree).[2] In other words, Plaintiffs do not appear to oppose the dismissal of this case as long as that will not prejudice (i.e., by *res judicata* or *collateral estoppel*) their forthcoming lawsuit. Likewise, relying on a provision in the Decree that allows them to recover attorney fees and costs incurred in monitoring and enforcing Defendants' compliance (Section XI.D),[3] Plaintiffs argue they would not be opposing the present motion had Defendants reimbursed them for the expert-witness fees and attorney fees incurred in reviewing the latest compliance report.

Finally, Plaintiffs also allege that the Decree should not be terminated because there continue to be serious CWA violations. Thus, seeing as the CWA is a strict-liability statute, Plaintiffs first argue that even small violations are sufficient to give rise to liability. Moreover, Plaintiffs argue that the existence of dozens of monitoring violations with respect to Section V.C hardly amounts to "substantial compliance" as required for termination of that provision.

### DISCUSSION

The Court agrees that all three of the remaining subsections have been satisfied. First, with respect to Section V.B, the record for the 12-month period indicates that there have been only 5 effluent limit exceedances out of 2,592 possible effluent limit exceedances. Because "isolated or

---

[2] At the oral argument, Plaintiffs' counsel represented to the Court that the only on-going monitoring and reporting violations that Plaintiffs wish to "preserve" for the new CWA lawsuit are those that are identified in Plaintiffs' expert's report submitted in support of Plaintiffs' opposition. [See Pl. Opposition, Ex. A].

[3] Section XI.D of the Decree provides: "Nothing in this Consent Decree restricts or otherwise compromises Plaintiffs' right to request reimbursement for attorney fees and costs incurred to monitor and to enforce Defendants' compliance with this Consent Decree. Defendants reserve any and all defenses to such claims."

1 sporadic exceedances" are excluded from the definition of "ongoing exceedances" in Section XV.A.2.a, the Court finds Defendants have "ceased ongoing exceedances" for a period of one year as required and thus have satisfied the requirements for termination of Section V.B. Likewise, because they have satisfied the requirements for termination of Section V.B, Defendants have also satisfied the requirements for termination of Section V.D, which is linked to exceedances of effluent limits. Notably, Plaintiffs do no challenge either of these reasons for termination.

As for Section V.C, the Court rejects Plaintiffs' argument that a "strict liability" standard should apply. Although Plaintiffs correctly note that the CWA is a strict-liability statute, pursuant to which it is irrelevant whether a violation is *de minimis* or committed in good faith, see Sierra Club v. Union Oil Co., 813 F.2d 1480, 1491-92 (9th Cir. 1987), vacated, 485 U.S. 931 (1998), reinstated with minor amendment, 853 F.2d 667 (9th Cir. 1998), that standard is only relevant to deciding whether Plaintiffs have a basis for filing a new suit. As far as termination of the Decree is concerned, however, because Section XV.3(b) expressly provides that Section V.C shall terminate upon Defendant's "substantial compliance" with the provided requirements, the Court has to apply that standard.

Looking at Defendants' efforts over the past seven years, the Court has no trouble concluding that they have substantially complied with requirements of Section V.C. "The phrase 'substantial compliance' is not susceptible of a mathematically precise definition." Joseph A. by Wolfe v. New Mexico Dep't of Human Servs., 69 F.3d 1081, 1085 (10th Cir. 1995). "Like 'reasonableness,' 'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." Fortin v. Comm'r of the Mass. Dep't of Pub. Welfare, 692 F.2d 790, 795 (1st Cir. 1982) (internal citation omitted). In the present case, the purpose of the consent decree was to protect the public interest in accordance with the CWA. Although noncompliance would undoubtedly affect that purpose, the Court notes that the violations in this case are either *de minimis* or were made in good faith.  In light of this, a compliance rate of 95% to above 99% for 11 of the past 12 months easily qualifies as "substantial compliance."[4]

---

[4] The Court also rejects Plaintiffs' argument that "substantial compliance" does not mean something less than "full compliance." Plaintiffs make this argument based on a sentence in Section XV.A.2.c, which provides that "nothing in this Paragraph shall be construed as suggesting that the Clean Water Act requires less than full compliance with the NPDES Permits." However, the fact that

Finally, the Court rejects Plaintiffs' remaining arguments. As for their intention to file a new lawsuit, that decision has no effect on whether the current Decree has run its course. Section XV provides specific provisions for when the Court can terminate the Decree and dismiss the case with prejudice. It would be improper for the Court to now "re-write" Section XV and dismiss the case without prejudice, even though all of the termination provisions have been satisfied. Likewise, there is no merit to Plaintiffs' argument that the case should not be dismissed because they still have not been paid some of the expert-witness fees and attorney fees. As Plaintiffs concede, Defendants had paid Plaintiffs such fees on prior occasions, and there is no reason to believe that the parties won't be able to work this out in this instance. In any event, the proper approach would be for the Court to dismiss the case with prejudice while retaining limited jurisdiction to resolve the issue of fees.

## CONCLUSION

Accordingly, the Court **GRANTS** the motion, **TERMINATES** the Consent Decree, and **DISMISSES WITH PREJUDICE** this action. The Court also retains limited jurisdiction to consider the issue of expert-witness fees and attorney fees, should the parties not be able to resolve the question by themselves.

**IT IS SO ORDERED.**

DATED: May 6, 2010

_____
IRMA E. GONZALEZ, Chief Judge
United States District Court

---

this proviso appears only in the paragraph dealing with "ongoing exceedances" (Section V.B), and that it refers specifically only to "this Paragraph," indicates that it was not meant to modify the "substantial compliance" standard that appears in a different and independent paragraph (Section XV.A.3(b)).